Filed 10/16/13  P. v. Toledo CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B238488 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA332015) |
| v. | |
| SARAH NICOLE TOLEDO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Candace Beason, Judge.  Affirmed.

Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Shawn McGahey Webb, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Sarah Toledo (defendant) guilty of conspiracy to commit murder and murder. On appeal, defendant challenges the sufficiency of the evidence in support of the guilty verdicts on the charged crimes and the true finding on the gang allegation. She also contends that the gang expert's testimony violated the confrontation clause and her right to a jury trial; the jury instructions on the gang allegation were unclear concerning the requirement that defendant must have personally acted to benefit the gang and with the specific intent to promote criminal conduct by gang members; cumulative error requires reversal; the trial court's failure to instruct orally on the elements of the firearm enhancement requires reversal of that sentence enhancement; her 50 years-to-life sentence constitutes cruel and unusual punishment; and the trial court erred in denying her *Pitchess*[1] motion.

We hold that substantial evidence supported the verdicts and the true finding on the gang allegation; defendant forfeited her confrontation clause challenge and that it lacks merit in any event; defendant forfeited her claim that the instructions relating to the gang allegation were unclear; the submission of the written instruction on the elements of the firearm enhancement to the jury raised a presumption that the jury followed that instruction; defendant's sentence does not constitute cruel and unusual punishment; and the trial court did not err in denying the *Pitchess* motion. We therefore affirm the judgment of conviction.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

# FACTUAL BACKGROUND

## A.     April 26 Assault on David Guerrero

In April 2005, 16-year-old David Guerrero had two older brothers, Gabriel, the oldest, and Daniel.[2]  David lived with his brothers, his parents, his sister Monica, and her children, but a few months prior to April 2005, Gabriel moved in with his "baby mama," Regina Zarate.  Monica had a boyfriend at that time named Jason Toledo who was defendant's brother.  Prior to April 2005, defendant would come to David's house and visit with Monica's children.  David considered defendant to be an aunt to his niece and nephew—like part of the family.

On the morning of April 26, 2005, David was involved in a fight with a group of males near his continuation school, during which fight he "beat . . . up" a member of the group.  After the fight, the group left in a "little white car," probably a Honda Civic.

At around 9:00 or 10:00 p.m. that same day, David was returning home from a friend's house.  As he waited by himself at a bus stop, he saw the same "little white car" parked nearby from which several people emerged.  Among the group was "a black guy, a white guy, [and a] Mexican [guy]."  The "black guy" was the same person with whom David had fought earlier in the day.  The group approached David and "started beating [him] up."  David heard members of the group saying "TDS."[3]  David did not know the people in the group, but had seen them for the first time earlier in the day during the fight near his school.  As a result of the beating at the bus stop, David suffered a separated shoulder, a broken nose, cuts to the back of his head, and bruised ribs.  Sometime after David was assaulted at the bus stop, he realized that the murder victim in this case, Ryan

---

**2**     Because several members of the Guerrero family were involved in this case, they will be referred to by their first names to avoid confusion.

**3**     David denied being a member of the rival KOL tagging crew.

Dassalla (the victim),[4] was among the group who assaulted him. But David did not tell anyone that the victim had been part of that group of assailants until August 2010.

David returned home after being released from the hospital early in the day following the beating. He spoke to Daniel and Monica in person and to Gabriel by telephone. He told each of them that he "got jumped" and that his assailants stole his cell phone. Gabriel, Daniel, and Monica were concerned and worried about the assault on David.[5]

**B.      Defendant's Telephone Call With Jiminez the Night Before the Murder**

Jonathan Jiminez[6] became acquainted with defendant when they attended San Gabrielino High School together; and they knew each other's cell phone numbers. In April 2005, Jiminez's girlfriend was a friend of defendant.

On the evening of April 26, 2005, Jiminez received a call on his cell phone from defendant. Defendant asked Jiminez, who was himself a member of a tagging crew, about a specific tagging crew called TDS. Although Jiminez could not remember at trial what defendant told him about why she was interested in TDS, Jiminez told a detective in May 2005 that during the call, defendant wanted to know whether Jiminez knew anyone from TDS. Jiminez also told the detective during the May 2005 interview that defendant asked about Milky, i.e., the victim, and another person named George. But Jiminez claimed at trial that he could not remember whether he also told the detective that

---

[4]      Dassalla's nickname was "Milky," and he had reddish brown hair and freckles "from his head down to his toes."

[5]      Los Angeles County Deputy Sheriff Orlando Macias interviewed David at the hospital on the night of the beating. David informed the deputy that he could not identify his attackers and that he did not want "to prosecute."

[6]      From the time he was first subpoenaed to testify in this case, Jiminez was reluctant to do so because he feared for his safety.

4

defendant informed him during the call that "TDS beat up [defendant's] brother's friend and they [TDS] were going to die for beating up her brother's friend."

The same detective interviewed Jiminez again in July 2005, and Jiminez told the detective that he had known defendant for awhile, but had not spoken with her for a long time prior to the cell phone call on the evening of April 26, 2005. Jiminez also told the detective during that second interview in July 2005 that defendant told him that she knew Milky and George were from TDS. Jiminez could not remember at trial, however, whether he also told the officer during the second interview that defendant told him that someone from "TDS was going to get killed because they [TDS] had jumped her brother's friend."

Jiminez was interviewed a third time in September 2005 by Los Angeles County Sheriff's Department Detective David Carver. During that interview, Jiminez told Detective Carver that, during the telephone call with defendant the night before the murder, she told Jiminez that she knew Milky and George were from TDS. But Jiminez could not recall at trial whether he also told Detective Carver that defendant said "someone from TDS was going to die for beating up David."

Jiminez testified in an August 2010 proceeding concerning his telephone conversation with defendant the night before the murder. During that testimony, Jiminez said that defendant called him to inquire whether he knew anyone from TDS, other than Milky and George. Jiminez also testified before the grand jury in May 2009. During that testimony, Jiminez stated that defendant seemed "mad" during his telephone conversation with her the night before the murder.


C.    Murder of the Victim

Approximately three days prior to April 27, 2005, Flora Andrade Henry (Andrade) moved from Las Vegas to the Los Angeles area to live with her boyfriend, Gilbert Cabrerra. Cabrerra's sister, Regina Zarate, was Gabriel's girlfriend. Andrade and Cabrerra moved into an apartment with Zarate, Zarate's mother, and Zarate's children. Gabriel did not live there, but would stay overnight.

On the morning of April 27, 2005, Andrade woke up and spent some time with Cabrerra, Gabriel, and Zarate. At some point, they decided to leave the apartment to cash Andrade's check. Prior to leaving, Andrade observed Gabriel talking on his cell phone. When he completed the call, Gabriel appeared to be in a bad mood. Cabrerra and Andrade then left the apartment to retrieve Zarate's mother's van from the repair shop. When Gabriel, Andrade, and Zarate subsequently entered the van,[7] Andrade believed they were going to cash her check. As he drove the van, Gabriel gave Andrade methamphetamine so she could "pack a bowl," i.e., place the drug in a pipe.[8] Andrade took a "hit" from the pipe and passed it to Zarate and Gabriel.

Instead of driving Andrade to cash her check, Gabriel drove to his mother's house to pick up some clothes. The group then left Gabriel's mother's house, with Andrade again believing they were going to cash her check.

As he drove the van, Gabriel received a call on his cell phone. When the call ended, Gabriel appeared "grumpy." Gabriel parked the van in a residential neighborhood near some pink apartments. Daniel and his friend then entered the van. Andrade noticed that Daniel was carrying a rifle. When Andrade saw Daniel with the rifle, she did not know what to think. Daniel's friend sat next to Andrade in the backseat of the van. Daniel sat on the other side of his friend behind Zarate who was sitting in the front passenger seat.

Andrade heard Gabriel mention something about gangs. Gabriel then received a phone call, but handed the phone to Daniel. During the phone call, Andrade heard Daniel say defendant's first name, Sarah, a few times. Daniel also mentioned to Gabriel during the call the name of a high school and a description of the male for whom they were looking—"he [Daniel] was saying red hair, freckles, and he said white boy."

When the van arrived at a high school, Andrade believed "something bad" was about to happen because Gabriel and Daniel were talking about gangs and Daniel had a

---

[7]    Cabrerra did not join the others in the van.

[8]    After Andrade met Cabrerra, she began to smoke methamphetamine regularly.

6

gun with him in the van. As the van entered a school parking lot, Andrade heard a bell ring and saw "a bunch of kids coming out" of the school. Gabriel and Daniel were looking for a male and were "pointing out" students to each other saying, "maybe that's him . . . ."

The van then left the high school and drove "a couple of blocks" into a residential area where Gabriel had noticed "two kids on a street by a tree." One of the "kids" matched the description that Daniel had repeated to Gabriel. Gabriel pulled the van alongside the two males and asked, "What gang do you clique with?" One of the males responded with a gang name "like TBS . . . ." Gabriel, Daniel, and his friend then exited the van, and Andrade saw Gabriel fighting with the male who matched the description Daniel had provided. Gabriel appeared as if he was trying to restrain the male, "giving him bear hugs . . . ." Andrade next heard Gabriel say, "You shot me." Daniel responded, saying, "I'm sorry, I'm sorry." The male with whom Gabriel had been struggling ran behind the van. Gabriel said, "Don't worry about me. Go get him." Andrade then heard two gunshots behind her.

Gabriel, Daniel, and his friend reentered the van, and Andrade heard Daniel say, "He is laying on the ground. I got him." A couple of minutes later, Andrade saw Daniel on the phone and heard him say the name Sarah. Daniel told the person on the phone, "Don't worry. We got him."

The van proceeded to Gabriel's mother's house where Daniel and his friend exited the vehicle. Gabriel next drove to Zarate's mother's apartment where Andrade exited and waited on the porch for Cabrerra to return. Gabriel and Zarate left in the van.

Cabrerra returned to the apartment about 20 minutes after Andrade arrived, and the two then left the location. They returned to the apartment "a couple of hours" later and saw police officers at the location. Andrade stayed at the apartment "a couple of more days" and then returned to Las Vegas. She never saw Gabriel, Daniel, or his friend again.

A couple of months after the shooting, the police contacted Andrade in Las Vegas. The first contact was by telephone with Detective Carver during which conversation

7

Andrade explained briefly to the detective what she had observed on the day of the shooting. Detective Okada and his partner later interviewed Andrade in person in Las Vegas and Detective Carver followed up that interview with another one a few months later. In each interview, Andrade told the detectives about Daniel's telephone conversations with defendant on the day of the shooting and about the description Daniel repeated concerning "a kid that's white with red hair and freckles."

On April 27, 2005, Joshua Navarro was attending San Gabrielino High School. He was a senior and classes usually ended around 2:00 p.m. He was a classmate of the victim, and that afternoon they walked together from school to the corner of Gladys Avenue and Scott Street trying to find a ride home. Navarro knew defendant who had attended San Gabrielino High School with him and the victim.

While they stood at the corner, Navarro saw a van or SUV approach. The victim "exchanged words"[9] with someone in the van, and then began fighting with "a few people" from the van, possibly as many as three. As Navarro started walking back toward the high school, he heard a gunshot and continued walking toward the school. Navarro met a friend and returned to the area of the altercation. The police interviewed Navarro that day.

On April 27, 2005, between 1:30 and 2:00 p.m., Marcelino Garza was pressure washing his father-in-law's house near the location of Gladys Avenue and Scott Street. He noticed "some activity going on down the street." He observed three or four males standing on the corner. A minivan stopped in the middle of the street near Scott and Gladys. Two males emerged from the van and began fighting with one of the males who had been standing on the corner. He saw a third male exit the driver's side of the vehicle and realized one of the men from the van was carrying a rifle. He then saw the male with the rifle fire into "the crowd." The three males that had emerged from the van reentered it, and Garza heard one of them say, "I got him." After the van "took off," Garza walked to the scene of the altercation where he saw the victim lying on the ground.

---

[9] Navarro testified at the preliminary hearing that someone in the van said, "Do you write?", which he understood to mean "do you tag?"

### D.    Investigation

On April 27, 2005, City of San Gabriel Police Officer Ray Lara responded to the scene of a shooting near San Gabrielino High School.  Officer Lara interviewed Navarro at the scene and obtained the following information from him.  Navarro and the victim were standing on the corner of Gladys Avenue and Scott Street when they were approached by three males in a red minivan.  The driver of the van asked, "Do you write?"  Navarro could not recall what the victim's reply was.  The three males exited the van and began striking the victim with their fists.  One of the assailants held a small rifle and he struck the victim in the neck with it.  As Navarro ran away, he heard a gunshot, looked back, saw one of the assailants lift up his shirt, and heard that assailant say, "You shot me."  The assailant with the rifle then pursued the victim as he ran across Gladys Avenue.  Navarro saw that assailant shoot at the victim twice and saw the victim fall to the ground on the sidewalk.  The three assailants then reentered the van and fled southbound on Gladys Avenue.

On April 27, 2005, at around 1:50 p.m., City of San Gabriel Police Detective George Cortez responded to the scene of a shooting near San Gabrielino High School.  He was one of the first police officers to respond.  He located the victim on the west sidewalk; the victim had been shot several times in the back, including the back of the head.  Detective Cortez determined that the victim was dead.[10]

The day after the shooting, Jiminez called Detective Cortez with information about the shooting.[11]  Jiminez told the detective that defendant had called Jiminez the night before the shooting and asked about the victim, George, and TDS.  Jiminez also told the

---

[10]    The medical examiner who conducted the autopsy on the victim confirmed that he had suffered four gunshot wounds—a nonfatal "through and through" wound to the left side of his abdomen; a nonfatal wound to the back of the right thigh with no exit wound; a nonfatal wound to his lower left leg that exited on the inner side of that leg; and a fatal wound to the back of his head with no exit wound.

[11]    Jiminez had previously provided Detective Cortez with information about a drug case on which the detective was working.

detective that the defendant stated that someone was going to be killed because her brother's friend had been jumped by members of TDS.

Based on the information from Jiminez, Detective Cortez contacted defendant and asked her if she knew anything about the shooting of the victim. Defendant said that she did not know anything about the shooting. The detective then asked defendant for her telephone number, which she gave him. When Detective Cortez told defendant that he would be obtaining records of her telephone calls, "she looked like she was going to poop her pants."

Detective Cortez reinterviewed Jiminez in July 2005, and Jiminez again confirmed the information about defendant's telephone call with him the night before the murder, including defendant's statement to Jiminez that someone was going to be killed for jumping her brother's friend. Detective Cortez turned over to Detective Carter the information he obtained from Jiminez.

Los Angeles County Sheriff 's Deputy Tamar Abraham responded to the scene of the shooting and was directed by Detective Carver to collect ballistic evidence. He recovered three expended shell casings, an expended bullet fragment, and one live round. Subsequently, he collected two bullet fragments from the coroner that had been recovered from the victim's body. Deputy Abraham also executed a search warrant at Zarate's mother's apartment. In a trash can on the balcony, the deputy recovered a rifle and two magazines that were wrapped in a black pair of jeans.

James Carroll was a forensic firearms examiner for the Los Angeles County Sheriff's Department. He examined, inter alia, the three expended cartridges and the expended bullet fragment recovered from the scene, as well as the rifle recovered from Zarate's mother's apartment. He determined that the three expended cartridges had been fired from the recovered rifle. He also examined the two bullet fragments recovered by the coroner and determined that they had been fired by the recovered rifle.

On April 27, 2005, Los Angeles County Sheriff's Deputy Steve Rubino served a search warrant at Guerrero's mother's house. David was present during the search and he told the deputy that both of his brothers were very upset when he told them he had been

10

beaten up. During the search, Deputy Rubino recovered a shoe box from a bedroom that contained gang graffiti and photographs with writing on them. He also recovered from the bedroom a sheet of paper with the words "Gabriel's phone numbers" written on it.

On April 27, 2005, Detective Carver was a homicide investigator assigned to investigate the shooting of the victim. After making an initial investigation of the shooting scene, Detective Carver put out a medical alert to area hospitals advising that one of the suspects may have been shot and may be in need of medical attention. He was later advised that a gunshot victim had entered Pomona Valley Medical Center with a through-and-through wound to the left flank. He went to the hospital and encountered Gabriel in the emergency room with a small caliber through-and-through wound to his left flank. Gabriel's girlfriend Zarate was with him.

After speaking with Zarate, Detective Carver went to her mother's apartment where he saw a red minivan parked in front. He determined that the van was owned by Zarate's mother. The deputy secured the location, asked the Pomona Police Department to impound the van, and returned to the Sheriff's station to write search warrants. The detective then interviewed Gabriel at the hospital, who was thereafter transported to the police department and booked. The detective next interviewed David who stated that he had been assaulted by several males the night before the shooting.

Based on information from David, Detective Carver contacted Jason Toledo and, eventually, Toledo's roommate Steven Escobar.[12] Information obtained from Escobar caused the detective to contact Andrade. Detective Carver interviewed Andrade by telephone and then directed his partners, Detectives Okada and Rubino, to interview her in Las Vegas.

Based on information from Detective Cortez, Detective Carver interviewed Jiminez by telephone in September 2005, and Jiminez told the detective that defendant had called Jiminez the night before the shooting and asked about the victim and George. Defendant also told Jiminez that the victim and George were going to die for beating up

---

[12] Gabriel informed Detective Carver that the third male in the van on the day of the shooting was named Steven, but provided no last name.

David. Jiminez further informed the detective that he was reluctant to become involved in the case due to fear of retaliation. According to Jiminez, defendant sounded upset during the telephone call, but he did not believe anything serious was going to happen. In 2009, before he testified before the grand jury, Jiminez confirmed for Detective Carver the statements defendant made during the telephone conversation the night before the shooting.

In September 2005, using information provided by Jiminez, Detective Carver contacted defendant and arranged to interview her the next day. He initially conducted the interview at a house, but thereafter transported her to the Sheriff's station where he recorded a second interview on a DVD. During the recorded interview, which was played for the jury, defendant provided the following information. She knew the victim from high school and knew his nickname was Milky. She was "cool with him" and they were "okay together."

Her brother, Jason Toledo, was in a "common-law marriage" with Monica Guerrero and they had two children. Defendant considered herself a sister-in-law to Gabriel, Daniel, and David.

Defendant did not see David on April 26, 2005, the day he was assaulted, but she knew he had been "beat up pretty badly." Defendant had been informed that, on the day of the assault, while David was picking up his girlfriend from school, he fought with a "black guy" from TDS named Duck. Afterward, David called Daniel who picked him up and dropped him at a friend's house. When David left the friend's house to take the bus home, "[a] carload of people . . . [with whom he had been in] the argument earlier, beat him up." He went to the hospital and received stitches.

Defendant, Daniel, and Monica knew David's cell phone had been taken, so they began to call the number for that phone on the evening of April 26. Eventually, Daniel and Monica contacted someone at that number who began "talking shit to them." The person who answered David's cell phone said something like, "so what[,] fuckin' who cares" and called David "a son of a bitch and stuff . . . ." That "just triggered Daniel even more." According to defendant, Daniel "had a temper" and he was "dumb."

12

Later that night, defendant called Jimenez and inquired about TDS. She told Jimenez she already knew about Milky and George, but wanted information about other members of TDS. But Jimenez did not give defendant any further information. Defendant then told Jimenez that "somebody might get their ass kicked over this," but did not remember telling him "someone's gonna die tomorrow."

### E.       Gang Evidence

Los Angeles County Sheriff's Sergeant Robert Gray testified as the gang expert. Sergeant Gray was familiar with a gang called VNE.[13] That gang originated in Boyle Heights in a housing project called Estrada Courts. In 2005, the VNE gang had in excess of 500 active gang members. The letters VNE were the common sign or symbol of the gang. VNE gang members also used hand signals that emulated the letters VNE. According to Sergeant Gray, the primary criminal activities of the VNE gang were murders, assaults, robberies, gun possession, drug sales, vandalism, and car theft.

The VNE gang claimed territory in Boyle Heights in the area that surrounded the Estrada Courts projects. The gang also claimed territory in East Los Angeles. Territory was important to a gang because gang members sold drugs within the territory they controlled and were therefore able to eliminate competition and make more money.

The VNE gang, like other Hispanic street gangs, had a hierarchy that started from the top down. At the top were the "shot callers," older gang members who were well respected and who directed the activities of the gang. The next level within the gang was comprised of the soldiers or enforcers who shot people and committed other violent crimes. Below the soldiers or enforcers were the "moneymakers" who made money selling drugs and who put that revenue back into the gang. There were also "peripheral" gang members "who [were] really not in the gang," but who associated with gang members and "did things for that gang."

_____

[13]       VNE stood for Varrio Nuevo Estrada.

13

To become a shot caller within a gang, a member needed to be well respected, and respect was gained by, for example, shooting rival gang members or committing other violent crimes. For gang members, respect was the equivalent of causing others to be fearful of or intimidated by them.

Gang members generally had monikers or nicknames that reflected the member's personality or his actions on behalf of the gang. The moniker "Stomper" was given to a gang member who was an enforcer. The word "Little" in front of a moniker like Stomper could be a nickname for a son or younger brother or younger relative of a gang member named Stomper.

In Sergeant Gray's experience, if a family member of a VNE gang member was assaulted, that gang member would be expected to retaliate. The retaliation would be tied to the need to gain respect and instill fear within the gang and the community. Failure to retaliate in such a situation would signal that the gang was weak, and its level of respect from other gangs and the community would be diminished.

If a VNE gang member did not retaliate after his younger brother was beaten up by a tagging crew, that member would, at a minimum, lose respect within the gang and be shunned. But if the failure to retaliate caused a serious level of disrespect toward the gang, the member might be killed.

Gangs commit violent acts to raise their status and reputation as a violent gang. The more fear a gang can instill in a community and in rival gangs, the easier it would be for the gang to conduct business. Sergeant Gray had spoken to victims of and witnesses to gang crimes, and they expressed fear of retaliation from various gangs.

In Sergeant Gray's opinion, VNE was a criminal street gang. Daniel Castillo was a VNE gang member who was convicted of murder and attempted murder. Larry Esquibel was also a VNE gang member and he was convicted of robbery and grand theft from a person.

Sergeant Gray was familiar with Gabriel based on his review of all the documents related to this case. In Sergeant Gray's opinion, Gabriel was a VNE gang member at the time of the victim's murder in 2005. He based that opinion on Gabriel's tattoos, police

14

department gang records, and the facts of this case. He also reviewed photographs recovered from the search at Gabriel's bedroom and those photographs contained information that confirmed Gabriel was a VNE gang member. One photograph showed Gabriel and other males throwing gang hand signs on New Year's Eve. Writing on the back of that picture included Gabriel's first name and moniker—Stomper—and next to those names was written "Danny" and "Little." Another document recovered during the search of Gabriel's room contained the names of and other information about various gang members.

Sergeant Gray was also familiar with Daniel from police department gang records and the documents relating to this case. Daniel's "13" tattoo indicated that he was a southsider or sureno, persons who are "commonly part of a gang." The number 13 referred to the thirteenth letter of the alphabet—m—which in turn referred to the "Mexican Mafia," a prison gang. Based on Daniel's tattoo and the sergeant's review of two case reports, he opined that Daniel was also a member of the VNE gang.

Sergeant Gray was not familiar with defendant and had no information indicating she was a gang member. It was common, however, for gangs like VNE to have associates who were not gang members, including female associates. Female associates were more likely not to be noticed by law enforcement officers than male gang members. For that reason, gangs used them as drivers or to hold drugs, money, or guns. Female associates were also used as messengers and to gather intelligence.

Based on a hypothetical question that included facts which closely mirrored the facts of this case, Sergeant Gray concluded that the sister-in-law[14] in the hypothetical question acted for the benefit of and in association with the gang in the question. The sister-in-law gathered and relayed information about the victim and the tagging crew that beat up the younger brother of the two gang members that helped the gang members

---

[14]    The female in the hypothetical question whose conduct mirrored that of defendant in this case was referred to as the "sister-in-law" of the two gang member brothers involved in the shooting of the victim. In her statement to Detective Carver, defendant said she considered herself to be a sister-in-law to Gabriel, Daniel, and David.

15

brothers complete their "mission." Also, if the sister-in-law knew the two brothers were from a specific gang, and she nevertheless worked in conjunction with them to facilitate the murder, that would be an indication that she was working in association with the gang.

In Sergeant Gray's opinion, the actions of the sister-in-law in the hypothetical question promoted, furthered, and assisted criminal conduct by gang members. The two gang members' killing of a member of a tagging crew that beat up the younger brother of gang members, with the assistance of the sister-in-law, promoted the status of the gang in the community by instilling fear and intimidation. The sister-in-law's actions also furthered gang activity by intimidating witnesses and making it easier for the gang to recruit new members. By gathering and relaying to the gang member brothers information about the target of the planned murder, the sister-in-law definitely assisted the brothers in completing their mission.

### F.    Defense Case

#### 1.    Defendant's Brother's Testimony

Jason Toledo was defendant's older brother. His ex-girlfriend was Monica Guerrero. He met Monica 10 or 12 years prior to trial and he fathered a son and daughter with her. Because of his relationship with Monica, Toledo knew her parents and her three brothers. Around 2004, Toledo started to separate from Monica. Before that, defendant was close to Monica and would visit Toledo's children.

The day before the April 2005 shooting of the victim, Toledo was at his apartment in Alhambra. Monica's mother called Toledo and asked him to come to her house and pick up Daniel who was upset by an incident involving David. Toledo picked up Daniel and drove him to Toledo's apartment. Daniel stayed overnight, sleeping downstairs on Toledo's couch. Toledo did not see Daniel with any weapon. The next morning, Toledo told Daniel that he was leaving for class and to lock the door if he left.

16

Toledo went to class and then went to his mother's house at around noon. When he arrived at his mother's house, he saw defendant, who was sick, lying down in her room. Toledo ate and then took a nap. Defendant woke Toledo up and told him that Daniel had called her and told her someone had been shot. Toledo tried calling the Guerrero home, but no one answered. He eventually learned about the shooting of the victim from news reports.

### 2. Defendant's Testimony

In 2005, defendant lived with her mother in San Gabriel. She attended San Gabrielino High School in 2000 and 2001. Because she fell behind in course credits, she began taking extra credit classes at the community education center. She returned to San Gabrielino for her senior year during 2004 and 2005.

Defendant met the Guerrero family around 2000 when her brother began dating Monica. Defendant felt close to Monica who had children with defendant's brother. Around 2005, Monica and defendant's brother began to split up. Although defendant was close to Monica, she rarely saw Gabriel, Daniel, or David. Her close relationship was with Monica and the children.

Defendant met Jiminez in 2001 when he began dating her close friend Denise. Defendant would see Denise several times a week, often at Denise's house where Jiminez lived. She considered Jiminez an acquaintance.

On the night before the shooting of the victim, Monica called defendant and told her that David had been attacked. Monica, who seemed concerned, told defendant who it was that attacked David and that they stole his cell phone. When Monica gave defendant the name of the tagging crew that attacked David, defendant believed Jiminez would know members of that crew. Defendant informed Monica that she knew someone who may know David's assailants and that she could attempt to get David's cell phone back.

Defendant called Jiminez, told him what had happened to David, and asked if Jiminez had heard about the attack on David. When Jiminez said he had not heard about the attack, defendant asked him if he knew anybody who might have David's cell phone.

Defendant believed Jiminez "was in a tagging crew, but was not sure which crew." Defendant did mention Milky and George because she knew that they would not have any involvement in the attack on David and, therefore, she did not need Jiminez to tell her their names. Defendant knew the victim from high school. They were acquaintances who had a math class together. She liked the victim and would never have passed on information that she knew would result in the victim's death. George was another acquaintance of defendant's from high school and she liked him also.

Jiminez did not have any information about other TDS members. Defendant's only purpose in asking Jiminez about TDS was to try to locate the person who had David's cell phone. Defendant never told Jiminez that someone was going to die for attacking David. She told Jiminez that "David might want to kick somebody's ass." She did not believe at the time of her conversation with Jiminez that David's brothers were going to be involved.

The day after her telephone call with Jiminez, defendant did not go to school because she was sick. She missed two calls on her cell phone and returned those calls on her "landline." When someone she did not recognize answered her call, defendant said, "This is Sarah. Did somebody call?" Daniel then took the phone and asked defendant if she knew where Monica was. When defendant said she had not seen Monica, Daniel told her he was "headed to San Gabrielino High."

About 10 or 15 minutes later, defendant called Daniel because she was concerned about why Daniel was going to her high school. She was worried that he was going there because of what happened to David. Gabriel answered defendant's call and said, "Sarah, I can't talk now. I got to go." Defendant did not in either phone call provide a description of the victim to the Guerrero brothers.

Defendant made a third phone call to the Guerrero's phone at about 2:30 p.m. that day. Daniel answered and told defendant he had shot someone. He sounded "real panicky and nervous." Defendant was concerned that someone from her high school may have been involved. Daniel said he shot "a white boy with red hair." Defendant did not

18

know who Daniel was describing, and she did not consider the victim to be a white boy with red hair.

As for Gabriel and Daniel's gang membership, defendant did not know Gabriel well. She did know at the time of the recorded interview with Detective Carver that Gabriel had just been released from prison and that he had tattoos. But she had no knowledge that Daniel was a gang member.[15] She did not see VNE tattoos on Daniel. But she did believe he was a member of a tagging crew.

## PROCEDURAL BACKGROUND

In an indictment, a County of Los Angeles grand jury charged defendant[16] in count 1 with conspiracy to commit a murder in violation of Penal Code section 182, subdivision (a)(1)[17]; and in count 2 with murder in violation of section 187, subdivision (a). The indictment also alleged as to counts 1 and 2 that a principal personally and intentionally discharged a firearm, a rifle, which proximately caused great bodily injury and death to the victim within the meaning of section 12022.53, subdivisions (d) and (e)(1). The indictment also alleged that the crimes in counts 1 and 2 were committed for the benefit of, at the direction of, and in association with criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C).

---

**15** As discussed below, defendant told Detective Carver in the recorded interview that she heard Gabriel and Daniel say they were from VNE and they had VNE tattoos all over their bodies.

**16** The indictment also charged Gabriel and Daniel with, inter alia, conspiracy to commit murder and murder. Gabriel was subsequently tried and convicted, but Daniel had not been apprehended at the time of defendant's trial.

**17** All further statutory references are to the Penal Code, unless otherwise indicated.

Defendant pleaded not guilty and denied the special allegations. The matter proceeded to a jury trial.[18] The jury found defendant guilty of conspiracy to commit murder and murder and also found true the gun use and gang allegations.

The trial court imposed but stayed sentence on count 1 pursuant to section 654. On count 2, the trial court imposed a 25 years-to-life sentence, plus an additional consecutive sentence of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1), for an aggregate sentence of 50 years to life.

## DISCUSSION

### A.     Substantial Evidence

#### 1.     Standard of Review

Defendant's  challenges to the sufficiency of the evidence in support of the jury's guilty verdicts on murder, conspiracy to commit murder, and the true finding on the gang allegation are governed by a substantial evidence standard of review.  "In assessing . . . a claim [of insufficient evidence], we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)  'The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)' (*People v. Rodriguez* (1999) 20

---

[18]     Defendant and codefendant Gabriel were originally tried together, but the trial court in that first trial granted defendant's request for a mistrial.

Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618] (*Rodriguez*).) [¶] Moreover, as observed in *Rodriguez*: 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'*If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.*'" [Citations.]'" [Citation.]' (*Rodriguez, supra*, 20 Cal.4th at p. 11, italics added; see generally *People v. Clark* (2011) 52 Cal.4th 856, 942-943 [131 Cal.Rptr.3d 225, 261 P.3d 243] (*Clark*), and cases cited.)" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.)

### 2. *Charged Crimes*

Defendant contends that there was insufficient evidence to support the guilty verdicts on murder and conspiracy to commit murder. According to defendant, the evidence that defendant was aware of and shared in Daniel's intent to kill the victim was "singularly thin." We disagree.

Defendant admitted that the night before the murder, she knew Daniel was upset about David's beating at the hands of the TDS tagging crew. According to Jiminez, the night before the murder, defendant called him seeking information about members of TDS. Then, according to Detectives Cortez and Carver, Jiminez said defendant told him that someone from TDS was going to die for beating up David. The next day as Gabriel and Daniel were searching for the victim, Andrade heard Daniel speaking to defendant and, during that conversation, Daniel repeated the name of a high school and a description of the victim. And shortly after the shooting, Andrade heard Daniel again speaking to defendant by cell phone, during which conversation Daniel said, "Don't worry. We got him." When first confronted by the police, defendant said she made no

21

calls to Daniel. But, after investigating detectives obtained defendant's telephone records, she admitted that she made certain calls and then gave her account of the telephone conversations.

The foregoing evidence supported a reasonable inference that on the night before the murder, defendant knew Daniel was upset that David had been beat up by members of TDS and that he intended to kill someone from TDS in retaliation for the beating. It also supported an inference that, knowing Daniel intended to kill a TDS member, defendant provided a location for and a description of the victim to Daniel on the day of the shooting to enable him to locate, identify, and ambush the victim, thereby facilitating the murder. In addition, the evidence that defendant called Daniel shortly after the shooting and was assured that the planned ambush had been successful further supported the reasonable inference that defendant was aware of and shared in Daniel's intent to kill the victim. The evidence was therefore sufficient to support the convictions on murder and conspiracy to commit murder.

### 3. *Gang Allegation*

Defendant argues that there was insufficient evidence to support the true finding on the gang allegation. Defendant maintains that there was no evidence to show that Daniel was a VNE gang member or that defendant was aware he was a VNE gang member and knowingly acted to benefit VNE and to promote or assist criminal gang activity.

Contrary to defendant's assertion, there was substantial evidence to support the true finding on the gang allegation. In her recorded interview with Detective Carver, defendant made the following statements about Gabriel's and Daniel's gang membership. "[Detective] Carver: Okay. David's from what gang or what—not gang. Sorry. What tagging crew? Toledo: KOL. [Detective] Carver: And you know what KOL stands for? Toledo: (Chuckle). [Detective] Carver: And you don't know what TDS stands for? Toledo: No. [Detective] Carver: Gabriel and Daniel, though, they're not from a tagging crew, are they? Toledo: No. [Detective] Carver: Where are they from? Toledo: From

22

VNE, right? [Detective[ Carver: And what—I'm asking you. Toledo: I don't know what it is. [Detective] Carver: Have you heard them say they're from VNE? Toledo: Yeah. It's all on their body. [Detective] Carver: Okay. They're tattooed with it? Toledo: Yeah. [Detective] Carver: Do you know what VN, VNE is? Toledo: No. [Detective] Carver: Okay. Uh, then we won't go into that. But you've seen it on their bodies? Toledo: yeah."

In addition to defendant's statements to Detective Carver, Andrade testified that as Gabriel and Daniel drove toward the high school in search of the victim, she heard them discussing gangs. Andrade also heard Gabriel tell Zarate that the beating of David was "gang-related."

The gang expert opined that both Gabriel and Daniel were VNE gang members. The expert based his opinion about Gabriel's gang membership on case files he reviewed, Gabriel's tattoos, his telephone list with information about known gang members, the gang graffiti on the shoe box found in Gabriel's room, and photographs of Gabriel throwing gang hand signs. As to Daniel, the expert based his opinion on Daniel's "13" Mexican Mafia tattoo and information from two unidentified case files.

Defendant's statements to Detective Carver about Gabriel and Daniel's VNE gang membership and the gang expert's opinion that the brothers were both members of VNE supported a reasonable inference that Gabriel and Daniel were VNE gang members and that defendant was aware of that membership. Although defendant testified at trial that she suspected Gabriel may have been a VNE member and that she believed Daniel was a tagging crew member, not a gang member, her recorded statement to Detective Carver demonstrated her awareness of their VNE gang membership, and the expert's opinions as to Gabriel and Daniel confirmed the fact of their VNE membership.

The evidence was also sufficient to support a reasonable inference that defendant acted for the benefit of VNE and with the specific intent to assist criminal gang activity. The evidence showed on the night before the murder, defendant was aware that David had been beaten up by TDS members and that Daniel, who had a temper and was a VNE gang member, was upset about it. The evidence also showed that defendant actively

sought information about TDS members from Jiminez and was aware that Gabriel and Daniel intended to kill one or more TDS members in retaliation for the beating of David. The day of the shooting Gabriel and Daniel discussed gangs and Gabriel told Zarate that David's beating was gang-related. As the brothers searched for the victim, defendant called Daniel and provided him with a location for and a description of the victim, and shortly after the shooting, she spoke with him again and was assured that the ambush and murder had been successful.

Based on that evidence, and the evidence showing that defendant knew Daniel was a VNE gang member, the gang expert opined that by gathering intelligence about TDS the night before the shooting and then calling and providing Daniel a location for and a description of the victim the day of the shooting, defendant acted for the benefit of or in association with VNE, a criminal street gang, with the specific intent to assist gang members in criminal activity, i.e., a gang-related retaliation murder. Defendant's own statements and actions on the night before and day of the shooting, when combined with the gang expert's opinion testimony, were sufficient to support the true finding on the gang allegation.

### B. Confrontation Clause Challenge to Gang Expert's Testimony

Defendant contends that Sergeant Gray's gang expert testimony that Daniel was a VNE gang member violated the Sixth Amendment's confrontation clause. According to defendant, to the extent Sergeant Gray's opinion about Daniel's gang membership was based on his review of two case reports, those reports were testimonial and defendant had a right to confront the persons referred to in the reports. But, because the reports were not admitted into evidence, defendant was unable to identify and confront the persons making the reports. The Attorney General asserts that defendant forfeited her confrontation clause challenge to Sergeant Gray's testimony by failing to object to that testimony.

Defendant's failure to object to Sergeant Gray's testimony that Daniel was a VNE gang member on the grounds it violated the confrontation clause forfeited that challenge

24

on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 730.) But even assuming defendant preserved that challenge on appeal, it would fail. The United States Supreme Court case upon which it is based—*Williams v. Illinois* (2012) __ U.S. __, 132 S.Ct. 2221—did not, as defendant suggests, overrule controlling California authority holding that a gang expert's opinion may be based on material that is not admitted into evidence or that it is generally inadmissible, as long as it is the type of material reasonably relied upon by gang experts. (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427; and *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210; as to post *Williams* cases in California, see *People v. Barba* (2013) 215 Cal.App.4th 712.)

Moreover, the statements in issue have not been shown to be "testimonial." As the plurality opinion in *Williams v. Illinois, supra,* 132 S.Ct. at p. 2242 stated, an out of court statement is testimonial if it has "the primary purpose of accusing a targeted individual of engaging in criminal conduct" and generally involves a "formalized statement [] such as affidavits, depositions, prior testimony, or confessions." There is no indication what the "case reports" were or whether they targeted specific individuals, or were formalized statements. Thus, there is no basis upon which to contend that they were testimonial.

In addition, even if error occurred, it was harmless beyond a reasonable doubt. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 651.) Defendant believed Gabriel and Daniel were "from VNE," "heard then say they were from VNE," and saw VNE tattoos on them.

As explained in *People v. Sisneros, supra,* 174 Cal.App.4th at page 154, "admission of expert testimony based on hearsay will not typically offend confrontation clause protections because 'an expert is subject to cross-examination about his or her opinion and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.' (*People v. Thomas, supra,* [130 Cal.App.4th] at p. 1210.)" Here, Sergeant Gray was subject to cross-examination and the two case reports upon which he

relied were the type of material reasonably relied upon by gang experts. Therefore, Sergeant Gray's testimony did not violate the confrontation clause.

### C.    Jury Instructions on Gang Allegation

Defendant asserts that the trial court's jury instructions on the gang allegation erroneously failed to make clear that the jury was required to find that defendant personally acted in association with, for the benefit of, or at the direction of a criminal street gang with the specific intent to promote criminal conduct by gang members. In a supplemental opening brief, defendant contends that CALJIC No. 3.31 did not make clear that in order to find the gang allegation true, the jury was required to find that defendant personally acted with the specific intent required by the gang statute. The Attorney General argues, inter alia, that defendant forfeited this claim of instructional error on appeal by not, at trial, objecting to the instructions or requesting clarifying language.

On the gang allegation, the trial court instructed the jury using CALJIC No. 17.24.2 as follows: "It is alleged in counts 1 and 2 that the crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." [¶] . . . [¶] The essential elements of this allegation are: 1. The crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang; and 2. These crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members."

The trial court also instructed the jury with CALJIC No. 3.31, which provided: "In the [crime[s]] [and] [allegation[s]] charged in Count[s] 1, 2, and the special allegation under Penal Code section 186.22(b)(1)(C), there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the [crime] [or] [allegation] to which it relates [is not committed] [or] [is not true]. [¶] [The specific intent required is included in the definition[s] of the [crime[s]] [or] [allegation[s]] set forth elsewhere in these instructions.]"

26

Defendant did not object to these instructions or request a clarification. Because the CALJIC No. 17.24.2 instruction tracked the language of section 186.22, subdivision (b), it was, generally, a correct statement of the law. (*People v. Poggi* (1988) 45 Cal.3d 306, 327 ["The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification"].) Similarly, CALJIC No. 3.31 accurately stated the requirement that there must be a concurrence of act and specific intent. (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1061 ["The instruction given [CALJIC No. 3.31] was an accurate statement of law"].)

"'A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.'" (*People v. Cleveland* (2004) 32 Cal.4th 704, 70.) Here, defendant failed to request that the trial court modify or clarify the instructions on the gang allegation to include language that emphasized that defendant must have personally acted to benefit the gang with the specific intent to promote criminal gang activity. She therefore forfeited this claim of instructional error on appeal.

### D.     Cumulative Error

Defendant maintains that the cumulative effect of the foregoing claimed errors deprived her of her state and federal constitutional rights to a fair trial. As explained, because the trial court did not err as claimed by defendant, there can be no cumulative error. "The zero effect of errors, even if multiplied, remains zero." (*People v. Calderon* (2004) 124 Cal.App.4th 80, 93 citing *People v. Loewen* (1983) 35 Cal.3d 117, 129.)

### E.     Gun Use Allegation

Defendant argues that the trial court's failure to instruct the jury orally on any of the elements of the gun use allegation requires the reversal of the sentence enhancement based on that allegation. Citing *People v. Murillo* (1996) 47 Cal.App.4th 1104, defendant asserts that when, as in this case, there is no indication in the record that the jury followed

the written jury instructions, it cannot be presumed that the jury followed those instructions.

After instructing the jury orally, the trial court advised the jury that it would receive written versions of the instructions. But, certain instructions from the packet of written instructions given to the jury were not read orally to the jury by the trial court, including CALCRIM No. 1402 which addressed the elements of the gun use enhancement under section 12022.53, subdivision (d) and (e)(1).

Contrary to defendant's assertion, absent evidence to the contrary, a reviewing court must "presume the jury was guided by the written instructions." (*People v. McLain* (1988) 46 Cal.3d 97, 115.) This rule is consistent with "[t]he crucial assumption underlying our Constitutional system of trial by jury"—i.e., "jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Here, because the jury was given a written instruction on the elements of the gun use enhancement, and there was no indication in the record that they failed to understand and follow that instruction, we must presume the jury followed that instruction. To the extent the decision in *People v. Murillo, supra,* 47 Cal.App.4th 1104 holds to the contrary, we chose not to follow it and, instead, follow the Supreme Court decisions discussed above concerning the presumption that jurors follow written instructions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In addition, there is no dispute that Daniel was the shooter and that a gun was used. Thus, given our conclusion that there was sufficient evidence that Daniel was a gang member, even if there was error, it was not prejudicial.

###    F.    Cruel and Unusual Punishment

Relying on the United States Supreme Court decisions in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and *Miller v. Alabama* (2012) __, U.S. __, 132 S.Ct. 2455 (*Miller*), defendant argues that her mandatory 50 years-to-life sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment because she was a 17-year-old juvenile when she committed the crimes and will not be eligible for parole until

she is 71 years old.  In a related argument, defendant contends that her sentence enhancement under section 12022.53, subdivisions (d) and (e)(1) violates the Eighth Amendment because it bears no relationship to her personal culpability.  Defendant also contends that her sentence violates the state and federal Constitutions because it is disproportionate.

### 1.    *Graham, Miller, and Caballero*

In *Graham, supra,* 560 U.S. 48, the court explained that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.  A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide [the defendant] with some realistic opportunity to obtain release before the end of that term."  (*Id.* at p. __, 130 S.Ct. at p. 2034.)

In *Miller, supra,* 132 S.Ct. 2455, the Supreme Court concluded that the reasoning in *Graham, supra,* 560 U.S. 48 "implicates any life-without-parole sentence imposed on a juvenile," including a sentence imposed on a juvenile convicted of murder.  (*Miller, supra,* 132 S.Ct. p. 2465.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court reviewed the 110 years-to-life sentence imposed on a juvenile convicted of attempted murder.  The Court held that, under *Graham, supra,* 560 U.S. 48 and *Miller, supra,* 132 S.Ct. 2455, term-of-years sentences imposed on juveniles, such as the 110 years-to-life sentence at issue in that case, were the functional equivalent of a life without parole sentence and therefore unconstitutional.  (*Caballero, supra,* 55 Cal.4th at p. 268.)

Here, unlike the sentences in the foregoing cases, the sentence imposed provided for the possibility of release, albeit not until defendant is 71 years old.  Thus, the sentence is not comparable to the 110-year sentence in *Caballero, supra,* 55 Cal.4th 262, which far exceeded the defendant's life expectancy or the life expectancy of any person in the United States.  Given the realistic possibility of release during defendant's lifetime, the sentence is not unconstitutional under *Graham, supra,* 560 U.S. 48 and *Miller, supra,* 132 S.Ct. 2455.  (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 17 [50 years-to-life

sentence not cruel and unusual punishment for 14 year old convicted of aiding and abetting gang-related murder].)

2.      *Section 12022.53, subdivisions (d) and (e)(1)*

Defendant's contention under section 12022.53, subdivisions (d) and (e)(1) has previously been rejected by the Courts of Appeal.  (See, e.g., *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1214-1215; *People v. Gonzales, supra,* 87 Cal.App.4th at p. 16; *People v. Martinez* (1999) 76 Cal.App.4th 489, 493-495.)  Defendant does not address these cases, much less provide persuasive argument as to why we should not follow them. We therefore reject this contention.

3.      *Disproportionality*

Defendant asserts that her sentence is disproportional under the state and federal constitutions.  According to defendant, as a juvenile offender, she did not appreciate the consequences  of her actions, and there was no evidence that she knew Daniel was armed. Thus, her 50 years-to-life sentence was grossly disproportionate to her personal culpability.

Under the state law prohibition against cruel or unusual punishment, a sentence is cruel or unusual if it is so disproportionate to the offense and the offender that it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.)  Under the Eighth Amendment to the federal Constitution, a sentence is cruel and unusual if it is grossly disproportionate to the severity of the crime.  (*Ewing v. California* (2003) 538 U.S. 11, 21.)  "Under both standards, the court examines the nature of the offense and the [offender], the punishment for more serious offenses within the jurisdiction, and the punishment for similar offenses in other jurisdictions.  (*Solem v. Helm* [(1983) 463 U.S. 277,] 290-291.)  Any one of these three factors can be sufficient to demonstrate that a particular punishment is cruel and unusual.  (*People v. Dillon* [(1983) 34 Cal.3d 441,] 487, fn. 38.)"  (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64-65.)  "The nature of the offense is viewed both in the abstract and in the totality of

30

circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind. [Citations.]" (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.)

"The judicial inquiry [into whether a sentence constitutes cruel and unusual punishment] commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. [Citations.]" (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.)

Here, the nature of the offense was a premeditated gang-related murder. The victim was shot in the back multiple times, including in the back of the head. The evidence showed that defendant actively participated in the crime by gathering information about the victim and the TDS tagging crew with knowledge that the victim would be killed. In addition, defendant provided a location for and a description of the victim to the Guerrero brothers as they were searching for him. That evidence supported a reasonable inference that, but for defendant's active assistance, the brothers could not have completed their intended crime. Thus, defendant had a high degree of personal culpability for the vicious, broad daylight murder of a 17-year-old high school student. (See *People v. Em* (2009) 171 Cal.App.4th 964, 972-973 [murder is a violent and serious crime and presents the highest level of danger to society].)

As for the nature of the offender, defendant points out that she was a juvenile with no criminal record. But she also associated with known gang members and actively assisted them in planning and completing a gang-related retaliation murder. As noted, by providing a location for and a description of the victim, defendant had a culpable state of mind.

31

Although defendant received a 50 years-to-life sentence for first degree murder, the punishment in this jurisdiction for more serious crimes could have been death or a longer term. Moreover, defendant has not demonstrated that the same crime in other jurisdictions is punished by less severe sentences. Based on the facts of this case, it cannot be said that defendant's sentence was disproportionate.

### G. *Pitchess* Motion

Defendant contends that the trial court erred when, prior to the first trial, it denied codefendant Gabriel's *Pitchess* motion in which defendant joined. According to defendant, a declaration of Gabriel's counsel attached to a prior *Pitchess* motion, in which she did not join, established facts sufficient to justify an in camera review of Detective Carver's personnel records.

#### 1. *Background*

In October 2009, Gabriel filed a *Pitchess* motion supported by the declaration of his counsel, but defendant did not join in that motion and there is no indication in the record that the first motion was ever ruled upon. The first declaration of Gabriel's counsel alleged, inter alia, that Detective Carver falsified statements that Jiminez made to him about defendant's statements to Jiminez. The declaration further alleged that Detective Carver also testified falsely at the preliminary hearing and before the grand jury about what Gabriel and other witnesses told him.

Over eight months later, in May 2010, Gabriel filed a second *Pitchess* motion with a different declaration from his counsel. That declaration focused on Detective Carver's alleged witness coercion and failure to disclose information favorable to the defense. According to that second declaration, Andrade originally told Detective Okada that she did not see a rifle in Daniel's possession when he entered the van. Detective Carver then allegedly went to Las Vegas and coerced Andrade to state falsely on tape that she saw Daniel with a rifle when he entered the van. The second declaration also alleged that when Detective Carver wrote a report about his conversations with Jiminez, he failed to

include the fact that Jiminez was a drug dealer and confidential police informant who had received leniency in prior criminal cases in exchange for information.

Defendant filed a written joinder in Gabriel's second motion, but did not support it with a declaration. At the hearing on the motion, the argument made by Gabriel's attorney, who also represented defendant at that hearing, focused only on the second declaration and the allegations of witness coercion and failure to disclose information. There was no mention of the first declaration or the allegations that Detective Carter had falsified reports and testimony about his conversations with Jiminez.

### 2. *Analysis*

As noted, defendant premises her claim of *Pitchess* error on the contents of the declaration in support of the first *Pitchess* motion. But defendant did not join in that first motion, and her joinder in the second motion did not expressly reference, and therefore did not discuss, the first declaration. Moreover, the transcript of the hearing on the second motion reflects that the first declaration was never mentioned during oral argument, and thus was not relied upon to support the motion. Therefore, the trial court did not err in denying the second motion as to defendant because she failed to submit facts or make arguments that would have warranted an in camera inspection of Detective Carver's personnel records.

## DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MOSK, J.


We concur:


TURNER, P. J.


KUMAR, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.